# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-2165

———————

| | |
|---|---|
| Randy E. Koons, | * |
| | * |
| Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the Western |
| | * District of Missouri. |
| Aventis Pharmaceuticals, Inc., | * |
| Aventis Integration Separation Plan, | * |
| for HRM Associates, | * |
| | * |
| Appellees. | * |

———————

Submitted:  December 15, 2003

Filed:  May 7, 2004

———————

Before MELLOY, BEAM, and COLLOTON, Circuit Judges.

———————

BEAM, Circuit Judge.

This case comes to us following a bench trial of Randall Koons' claims for ERISA-protected severance benefits under 29 U.S.C. § 1132(a)(1)(B) and for interference with his ability to attain such benefits under 29 U.S.C. § 1140. The trial court[1] found for the defendants, the Aventis Integration Separation Plan for HMR Associates (the Plan) and Aventis Pharmaceuticals, Inc. (Aventis), on both claims and

_____

[1]The Honorable Sarah W. Hays, United States Magistrate Judge for the Western District of Missouri, sitting by consent of the parties pursuant to 28 U.S.C. 636(c).

entered judgment accordingly. Koons appeals, claiming the trial court erred in finding that he was not entitled to severance benefits and that he was not terminated by Aventis with the intent to interfere with his ability to claim severance benefits. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

Randall Koons had worked for Aventis and its predecessor companies since 1985. He was terminated on October 14, 2000, from his position as Head of U.S. Security. Aventis was in the midst of reorganizing its corporate structure and operations as part of a merger, which included moving Koons' Kansas City office to New Jersey. As part of the reorganization, it provided a severance plan[2] to associates, including Koons, whom the move affected. After Koons' termination, Aventis refused to pay Koons any severance benefits. The reasons cited by Aventis for Koons' termination and its refusal to pay severance benefits under the Plan were violations of company policy that Koons committed in the months preceding the termination.

By all indications, Koons' performance had been generally positive until near the end of his employment. The record is replete with praise and favorable performance evaluations. In October 1999, Koons first learned that his Kansas City office was going to be moved to New Jersey. Because Koons did not want to relocate to New Jersey, he and Mark Shaw, his supervisor at the time, established his end date as December 31, 2000. Koons was made aware of the severance benefits that were available.

---

[2]A "Key Associate Retention Program" was also established by Aventis to retain key employees during the transition. Aventis made Koons a participant under this ERISA-governed plan. Because this second plan was by its terms subject to the same conditions as the Integration Separation Plan for HMR Associates, we speak in terms of the Integration Separation Plan for HMR Associates.

Jan Kneib and Kurt Waier worked in the security division of Aventis under Koons' supervision. Kneib was also unwilling to locate to New Jersey and established an end date of December 31, 2000. However, in March 2000, because the transition budget was running $14 million per month in the red, Shaw moved Kneib's end date up to April 30, 2000. Koons objected[3] and voiced his concerns not only to Shaw, but also to (among others) Jerry Belle, the President of North American Operations for Aventis. This upset Shaw, who felt Koons had departed from protocol and gone over his head. Notwithstanding Koons' objection, Shaw ended Kneib's employment on April 30, 2000. After her termination, Koons allowed Kneib to retain her company-paid cell phone. Waier remained in Aventis' employ.

In May 2000, Shaw hired Brian Keller as Koons' replacement. Keller's immediate supervisor was Shaw. After Keller was hired, Koons' responsibilities were limited to security at the soon-to-be-closed Kansas City site.

In June 2000, Keller met with Koons and urged Koons to retire because there was nothing left for him to do. Koons refused, but the two agreed on a new end date—November 15, 2000. Keller and Koons also agreed that Koons would work from home, rather than coming into the office. Keller sent a letter to Koons, dated July 17, 2000, memorializing this agreement and reminding Koons to contact Jerry Johnson, the Human Resources Manager, in early November regarding his severance pay. This letter also advised Koons that he should continue to be available through his company-paid cell phone. A memorandum sent from Human Resources to Koons one week later confirmed the changed end date and outlined Koons' anticipated severance benefits.

---

[3]He objected for several reasons but mainly because Kneib, as the only woman in the security division, was responsible for several sensitive projects.

Through July and August, Koons worked from home and came into the office on a regular basis. Koons was pursuing a real-estate career while still on Aventis' payroll. Shaw, Johnson and Keller were all aware of this and approved. In August, Koons' charged 3,321 minutes to his cell phone despite the fact he was doing little Aventis work. Waier received the August invoice and noticed the high number of minutes attributed to Koons' phone and that Kneib was also using a company-issued phone post-termination. He forwarded the invoice to Keller, noting his observations. Around this time, Johnson also notified Keller of complaints he had received from individuals who had gotten notices in the mail of Koons' status as a real-estate agent. Koons had used a list of associate addresses, which Aventis had marked as confidential, to mail out these advertisements.

Keller contacted Shaw regarding Koons' cell-phone use when he received the invoice. He later went to see Shaw and told him of the Kneib situation, showing him the invoice. Shaw had also received a complaint from an employee who received one of Koons' mailings.

At some point, Johnson investigated the propriety of using cell phones for personal use within the security division. He contacted Steve Krohne, who was Koons' supervisor and the head of security until early 1999, and Waier. Each stated that the personal use of cell phones was permissible, so long as within reason. According to Johnson, he kept notes of the investigation on his computer and forwarded them to New Jersey in paper form. Aventis was unable to locate this document and the electronic media upon which it was stored was destroyed.

Keller and Johnson met with Koons in early October 2000 and questioned Koons about what they had discovered. Koons offered no explanation and contended that all of his actions were allowed under company policy.

Johnson, Keller, Shaw, and Kathleen Clever (Aventis' corporate counsel) met on October 9, 2000, and discussed the Koons situation. By all indications, those at the meeting understood that Koons would not be entitled to severance benefits if he was terminated. The decision to terminate Koons was made and his employment ended October 14, 2000, approximately one month before his November end date.

Aventis cited three instances of misconduct in a "service letter" to Koons explaining why he was terminated. This letter is required at the employee's request under Missouri law. See Mo. Rev. Stat. § 290.140 (West 1993). Koons later requested his severance benefits. Aventis responded in a letter from Clever stating that Aventis would not pay severance benefits given the circumstances of Koons' termination.

At trial, Aventis adduced evidence concerning the various policies that it thought Koons had violated. First, there was an unwritten policy concerning "reasonable" personal use of cell phones. And there was a written "Business Conduct Policy" which addressed the permissible use of Aventis' communications systems. The written policy stated, "While it is recognized that associates will occasionally use the systems for personal communications, it is expected that such exceptions will be kept to a minimum . . . ." Aventis concluded Koons' personal cell-phone use violated these policies. And, by allowing Kneib to retain her cell phone and make excessive personal calls, Aventis concluded Koons had further violated company policy. Second, the Business Conduct Policy admonished employees to avoid conflicts of interest and stated "A conflict may exist if . . .[y]ou use the Company's confidential information for your personal benefit." Aventis concluded Koons' use of the confidential associate address list violated this policy. Shaw also cited written policies concerning standards of business conduct and recordkeeping and data integrity, and an unwritten policy prohibiting acts of dishonesty or falsification, as having been violated by Koons' conduct.

The trial court found Koons had been terminated for violating company policy, which, under the terms of the Plan, made him ineligible for benefits.  The trial court also concluded that Koons' termination for misconduct was a legitimate, nondiscriminatory reason for his discharge, and, because Koons had not shown that this reason was a pretext for an intent to interfere with Koons' severance benefits, his claim under 29 U.S.C. § 1140 also failed.

## II.    DISCUSSION

### A.    Entitlement to Severance Benefits

The trial court conducted a de novo review of Koons' claim for severance benefits.  That standard of review is unchallenged here and we express no opinion on its use.  After a bench trial in an ERISA case in which the trial court conducts a de novo review, we review the trial court's factfinding for clear error and its legal conclusions de novo.  Donatelli v. Home Ins. Co., 992 F.2d 763, 765 (8th Cir. 1993); Fed. R. Civ. P. 52(a).

Koons' entitlement to severance benefits turns on both questions of fact and of law.  The trial court found that Koons was terminated for violating company policy.  Under the terms of the Plan, as construed by the trial court, those who were terminated for violating company policy were ineligible for severance benefits.  Koons challenges the trial court's finding that he violated company policy and its construction of the Plan's terms.

We review the trial court's interpretation of the Plan de novo.  Melvin v. Yale Indus. Prods., Inc., 197 F.3d 944, 947 (8th Cir. 1999).  The Plan's description states:

A participant is eligible for a Separation Package if . . . the participant's employment is terminated by the Company as a direct result of the

elimination of his or her position due to the Company's reorganization and such termination is not a direct result of the associate's voluntary resignation, death, disability, unsatisfactory performance or violation of Company policy.

Koons argues that if he was terminated for violating company policy, he should still be eligible for severance benefits under the Plan because the Summary Plan Description (SPD)[4] does not contain the same language. The SPD states that eligible associates include those who are terminated as a result of the reorganization and goes on to state:

> *Note: In order to receive benefits under the Separation Plan, eligible associates must perform satisfactorily during the notice period . . . .*

Koons' argument rests on the notion of conflicting plan documents. That is, where an SPD conflicts with the terms of another plan document, it has often been said that the SPD governs. E.g., Jensen v. SIPCO, Inc., 38 F.3d 945, 952 (8th Cir. 1994). This general rule, though, is qualified. Specifically, "this rule of construction does not apply when the plan document is specific and the SPD is silent on a particular matter." Id. And, if the SPD does conflict with other plan documents, a participant must generally show that he relied on or was prejudiced by the SPD's description of the plan's benefits. Dodson v. Woodmen of the World Life Ins. Soc'y, 109 F.3d 436, 439 (8th Cir. 1997). Reliance or prejudice, however, is not required if the SPD is not "faulty." Palmisano v. Allina Health Sys., Inc., 190 F.3d 881, 887 (8th Cir. 1999).

---

[4]Neither the parties here, nor the court below, questioned whether this summary was an SPD. So we assume that it is one. But see Palmisano v. Allina Health Sys., Inc., 190 F.3d 881, 888 (8th Cir. 1999) (concluding that a plan description that is "hopelessly inadequate as an SPD" cannot be a valid basis for severance benefits).

We see no conflict between these two descriptions of the Plan's eligibility requirements. On the issue of whether being terminated for a violation of company policy is a condition of eligibility, the Plan's description includes such a condition, while the SPD is silent, as it is with death, disability, and resignation.

Even if we define the relevant issue more broadly, the outcome does not change. Koons claims the issue of eligibility was addressed in both the SPD and the Plan's description. He argues that, to the extent the SPD stated fewer eligibility requirements, it should govern. As support, he cites to 29 C.F.R. § 2520.102-3, claiming the SPD was inadequate. This regulation provides that an SPD for an employee benefit welfare plan like the one involved here must "include a statement of the conditions pertaining to eligibility to receive benefits." Id. at § 2520.102-3(j)(2). And the SPD must contain "a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, [or] forfeiture . . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits required by paragraph[] (j)." Id. at § 2520-102-3(*l*). These regulations clarify the statutory SPD requirements of 29 U.S.C. § 1022.

Aventis' SPD likely violates ERISA and the regulations promulgated thereunder. This makes the SPD "faulty." Marolt v. Alliant Techsystems, Inc., 146 F.3d 617 (8th Cir. 1998). Neither ERISA nor the regulations state the consequences of issuing such a faulty SPD. Our cases, though, have clearly established that a claimant can only recover under a faulty SPD if he can show reliance on or prejudice from the faulty plan description. See Palmisano, 190 F.3d at 887-88 (collecting cases). Koons testified that he knew from the seven-page Plan description, despite the one-page SPD purportedly to the contrary, that if he was terminated for violating company policy, he would not be entitled to severance benefits. The fact he did not refrain from his misconduct despite this knowledge, may indicate he did not know his

conduct violated company policy (the existence of which we address below), but it in no way establishes reliance on or prejudice from the faulty SPD.

Thus, under the terms of the Plan, Koons would be entitled to severance benefits if (1) he was terminated (2) as a direct result of the elimination of his position due to the company's reorganization and (3) his termination was not a direct result of his violation(s) of company policy.

Koons was terminated. And his termination likely would not have occurred had Aventis not reorganized and relocated the security division to New Jersey. The fighting issue is whether Koons violated company policy.

The trial court concluded that Koons had violated company policy by allowing Jan Kneib to retain her cell phone after her employment was terminated, by using his cell phone for an inordinate amount of personal calls, and by using a confidential list of associate addresses to mail out promotional material concerning his real-estate endeavors. We review this factfinding exercise for clear error. Donatelli, 992 F.2d at 765.

There is abundant evidence in the record in support of the trial court's findings, at least with regard to Koons' personal use of his cell phone and his unauthorized personal use of the associate address list. As to each, a reasonable factfinder could conclude that there was a policy in place and that the policy was violated. Therefore, we cannot conclude that the trial court clearly erred in finding that Koons violated company policy.

As to Aventis' disagreement with Koons' decision to allow Jan Kneib to retain her cell phone after her termination date, we believe the record only establishes that Koons did not exceed his authority in making this decision. Aventis allowed various employees to retain cell phones post-termination. And Koons himself was allowed

to retain his cell phone after he began working from home. While each situation does not present the same circumstances as Kneib's, each does show the propriety of the business necessity that Koons felt justified his decision with regard to Kneib—to stay in touch with those individuals who are no longer around and who have knowledge that is useful to the company. While this finding may be clearly erroneous, the trial court's factfinding with regard to the other violations of company policy is not, and those violations adequately support the result reached. We therefore conclude that the trial court properly held that Koons had violated company policy.

Koons claims at various points in his brief that the decision to terminate him was arbitrary and capricious or otherwise unreasonable. We pause to note that we are not charged with evaluating the wisdom of the particular employment action. See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995). ERISA, through its protection of certain benefits, is not a mechanism through which general claims of wrongful termination can be brought. Whether the decision to terminate Koons was arbitrary and capricious is irrelevant to whether Koons was entitled to benefits under the Plan. The ability to claim benefits is set by the plan's terms and, here, Koons was simply not entitled to benefits because the trial court found his termination, however unfair or unwise, was for violating company policy.

**B.      Interference with the Attainment of Severance Benefits**

A certain sort of wrongful-termination claim, however, can be brought through ERISA. ERISA, 29 U.S.C. § 1140, states that it is unlawful for "any person to discharge . . . or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." To succeed, Koons had to prove that Aventis terminated his employment with the "specific intent" to interfere with his severance benefits. Jefferson v. Vickers, Inc., 102 F.3d 960, 964 (8th Cir. 1996). This specific intent is present where the employee's (future or present) entitlement to protected benefits is

a motivating factor in the employer's decision. See Regel v. K-Mart Corp., 190 F.3d 876, 881 (8th Cir. 1999). A factor is motivating if it can be said that it has "a determinative influence on the outcome." Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 141 (2000) (quotation omitted). In other words, Koons had to show that he would not have been terminated had he not been entitled to benefits.[5]

Because this standard of causation is an inquiry concerning the employer's intent, the three-stage McDonnell Douglas framework applies. Jefferson, 102 F.3d at 964. On appeal from a factfinder's verdict though, the three stages of McDonnell Douglas fade and we focus on the ultimate question of whether the plaintiff carried his burden of proof as to the employer's intent. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993) ("'[T]rial courts or reviewing courts should [not] treat discrimination differently from other ultimate questions of fact. Nor should they

---

[5]We note that the use of the term "motivating factor" is sometimes inexact. In some cases, the term "motivating factor" is used as part of the so-called mixed-motive analysis. When a plaintiff makes a mixed-motive claim and establishes the unlawful consideration was a motivating factor in the employer's decision, the employer is saddled with the burden of proving that the adverse employment action would have occurred notwithstanding the unlawful consideration. See Stacks v. Southwestern Bell Yellow Pages, Inc., 996 F.2d 200 (8th Cir. 1993) (per curiam). In other words, if an employer in a mixed-motive case can prove that the motivating factor was not determinative, i.e., the adverse employment action would have occurred anyway, then it can avoid liability, or at least some liability depending on the statutory scheme. Thus, in a mixed-motive case, a factor which motivates is not necessarily determinative.

But this is not a mixed-motive case. Here, the term "motivating factor" means determinative factor. As much is clear from the fact that such factors have been described as "ha[ving] a determinative influence on the outcome." Reeves, 530 U.S. at 141; see DiFederico v. Rolm Co., 201 F.3d 200, 207 n.3 (3d Cir. 2000) (stating in an ERISA intentional-interference case, "[I]t is preferable, in a pretext case analysis, to speak either in terms of 'determinative' as the district court did in this case, or 'real reason' as the Supreme Court did in *Hicks*." (citations omitted)).

-11-

make their inquiry even more difficult by applying legal rules which were devised to govern "the basic allocation of burdens and order of presentation of proof," *Burdine,* 450 U.S., at 252.'") (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)); Ryther v. Kare 11, 108 F.3d 832, 848 (8th Cir. 1997) (en banc) (Loken, J., dissenting but writing for the court).

The trial court held that Koons failed to prove that he was terminated for the purpose of interfering with his ability to attain severance benefits because Koons failed to persuade the trial court that Aventis' articulated reason for his discharge was pretextual. We approach this determination with a clear-error standard of review. See Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (stating that "a finding of intentional discrimination is a finding of fact"); Benham v. Lenox Sav. Bank, 292 F.3d 46, 48 (1st Cir. 2002) (applying clear-error standard of review to ERISA § 510, 29 U.S.C. § 1140, determination). The question we must answer is whether the trial court clearly erred in concluding that Aventis did not terminate Koons' employment for the purpose of interfering with his severance benefits.

At trial, Koons' basic claim was that Aventis chose to terminate him because it did not want him to receive his severance pay. As support, he adduced the following evidence: he was terminated after fifteen years of exemplary service and one month before his scheduled end date; Shaw and others were aware at the time of Koons' termination that he would lose his severance benefits and Shaw felt that such a loss was a justifiable consequence of his behavior; a degree of personal animosity had developed between him and Shaw over Kneib's early termination; Koons' termination saved Aventis as much as $200,000 in severance benefits and remaining salary; and the cell-phone bill totaled little more than $700.

Aventis countered by claiming that it fired Koons for violating company policy. As support, it cited Koons' conduct that it believed was in violation of company policies: his inordinate cell phone usage, the fact he allowed Kneib to keep

her cell phone, and his use of the confidential associate address list to mail out his real-estate advertisements.[6] Aventis also presented evidence that it paid over $50 million in severance benefits to the hundreds of other associates who were entitled, and it terminated no other Plan participants for misconduct prior to their end dates. And it showed that Shaw, the person ultimately responsible for Koons' termination, specifically denied that Koons was terminated for the purpose of interfering, even though he felt the consequence was warranted.

Koons sought to discredit the employer's articulated reasons by establishing that other employees were not fired under similar circumstances and that he had not violated company policy. As explained above, the conclusion that Koons in fact violated company policy is not clearly erroneous. Koons' only remaining argument is that he was nonetheless terminated for the purpose of interfering with his future entitlement to severance benefits. Extending the factfinding deference required, we conclude the trial court did not clearly err in finding that he was not.

Koons' claim that other employees were not terminated under similar circumstances demonstrates little. Koons describes this as "disparate treatment." After reviewing the record we see no evidence of any employees who were (1) treated more favorably, (2) "'similarly situated in all relevant respects,'" EEOC v. Kohler Co., 335 F.3d 766, 776 (8th Cir. 2003) (quoting Lynn v. Deaconess Med. Ctr.-West Campus, 160 F.3d 484, 487 (8th Cir. 1998)), and (3) "outside the plaintiff's protected class," i.e., unendowed with the characteristic that is protected under ERISA—here, a (future or present) entitlement to severance benefits under the Plan. See Hitt v. Harsco Corp., 356 F.3d 920, 925 (8th Cir. 2004) (ADEA case stating that more

---

[6]The issue addressed here is not whether Koons in fact violated company policy, but rather whether Aventis terminated him with the requisite intent to interfere with his ERISA benefits. Even if Koons had not violated company policy, if Aventis honestly believed he did and terminated him for that reason, then no section 1140 action would exist. See Wilking v. County of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998).

lenient treatment of an assumably comparable employee was not evidence of disparate treatment where the comparable employee was a member of the plaintiff's protected class). To the extent Aventis may have acted inconsistently in disciplining its employees, this does not prove an intent to interfere with his severance benefits. At most, when considered in conjunction with the timing of Koons' termination, it is merely some evidence of an unlawful motive. Given Koons' misconduct in light of the extant Aventis policies, and the fact other employees were terminated for similar misconduct, our standard of review does not give us the ability to make the factual leap from inconsistent treatment to intentional interference.

It is also clear from the record that Aventis was not hard-pressed to save money by terminating employees on trumped-up charges of policy violations to void their entitlement to severance benefits. That much is true from the evidence regarding the total amount of severance benefits that were paid to employees under the Plan. Thus, Koons' evidence of a financial motive to interfere with his severance benefits carries little weight.

As to the personal animosity that had arisen between Koons and Shaw over the early termination of Kneib, this evidence merely attributes to the employer a motivation which is not unlawful. ERISA does not prohibit employers from firing employees they don't like, so long as their purpose is not to interfere with the employees' benefits. If the animosity was as strong as Koons claims, then it seems unlikely that Koons' entitlement to benefits played any, much less a determinative, role in Aventis' decision.

The record does indicate that those who determined Koons should be terminated were aware that he would not be eligible for severance benefits if they terminated him. Indeed, Shaw testified that he believed the loss of severance benefits was a justified consequence of Koons' misconduct. Relief is not warranted under ERISA merely because the employer was disproportionate in its punishment. Hutson,

-14-

63 F.3d at 781. And if the loss of severance benefits is only incidental to the termination, Koons would also not be entitled to relief. <u>Regel</u>, 190 F.3d at 881. It is hard, then, to see how an employer's awareness of the consequences of its business decisions attributes to it an unlawful intent, especially to the extent it would take to reverse the trial court's decision at this juncture. Shaw testified that the termination did not hinge on Koons losing his severance pay, and to the extent Koons attacks his credibility, this is typically not a valid ground upon which to overturn a factfinder's conclusion. <u>See</u> <u>Fed. R. Civ. P.</u> 52(a); <u>Anderson</u>, 470 U.S. at 575.

## C.  Aventis' Lost Document

Aventis lost a document pertaining to Koons' termination before this litigation began. Specifically, an investigation into Koons' conduct was done by Johnson, who prepared a "Case History." The Case History purportedly contained Johnson's notes of conversations he had with Krohne and Waier regarding the policies in place at the time of Koons' termination. The paper copy of that document appears to have been lost in transit or after it arrived in New Jersey, during the course of Aventis' reorganization. Johnson's hard drive, which contained the document, was also erased. Johnson testified to what would have been contained in that document and Waier testified to what he told Johnson.

As to Koons' claim for benefits, a trial court conducting a de novo review may expand the scope of what it will consider beyond the evidence that was before the plan administrator at the time it made its decision if "good cause" to do so exists. <u>Donatelli</u>, 992 F.2d at 765. Koons argues that there was no good cause to consider any evidence other than the document, without the document there was no proof of a policy violation, and, thus, the trial court's decision was clearly erroneous. But there is no reason to assume the trial court considered any evidence in conjunction with the claim for benefits that did not exist at the time the decision was made. Even if it had, the lack of a true administrative record in this case, which could be attributed

to either party, would allow the trial court, in its discretion, to consider additional evidence. See Dishman v. UNUM Life Ins. Co., 269 F.3d 974, 986 (9th Cir. 2001). Under these circumstances, we see no reason why either party should be heard to complain that too much evidence was before the trial court.

Koons was also not entitled to an adverse inference of Aventis' intent to interfere with his severance benefits. The trial court drew no adverse inference from the loss of the document because Koons made no showing that Aventis had intentionally lost or destroyed the information: "[T]he evidence suggests that during the move of the company's corporate offices and the turnover of employees, this file was accidently misplaced."

Substantial evidence supports this finding. See Stevenson v. Union Pacific R.R. Co., 354 F.3d 739, 745 (8th Cir. 2004) (standard of review). Thus, sanctions in the form of an adverse inference would have been inappropriate. See id. at 746-47 (holding that a showing of bad faith—"an intent to destroy the evidence for the purpose of obstructing or suppressing the truth"—was required before an adverse inference could be imposed for the prelitigation destruction of documents pursuant to a document retention policy). Koons makes much of the fact that the loss of these documents contravened Aventis' own document retention policy. We agree that this is some evidence suggesting bad faith, and we in no way condone Aventis' conduct. After reviewing the record, however, we cannot say the trial court abused its discretion in concluding the loss was accidental.

Moreover, Koons made no showing that he was prejudiced by the loss. See id. at 748 (prejudice required before sanctions are appropriate). All that has been shown is that the document contained Johnson's notes regarding his investigation of Koons. Johnson testified at trial, and there was no evidence that the document he created contained anything that would have harmed Aventis or helped Koons in the course of this litigation.

-16-

We have considered all of Koons' other arguments and find them without merit.

## III.   CONCLUSION

We affirm.

_____